UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| WILDLIFE ACOUSTICS, INC., Plaintiff, v. FRONTIER LABS PTY., LTD., Defendant. | Civil Action No. 1:20-cv-10620<br><br>**JURY TRIAL DEMANDED** |
|---|---|

## COMPLAINT AND JURY DEMAND

Plaintiff Wildlife Acoustics, Inc. ("Wildlife"), by and through its undersigned counsel, hereby bring this Complaint against Defendant Frontier Labs Pty. Ltd. ("Frontier"). Wildlife alleges as follows:

## PARTIES

1. Plaintiff Wildlife is a Massachusetts corporation having a principal place of business at 3 Mill and Main Place, Suite 210, Maynard, Massachusetts 01754-2657.

2. Upon information and belief, Defendant Frontier is an Australian corporation having a place of business at QLD 4111, Brisbane, Australia.

## JURISDICTION AND VENUE

3. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*.

4. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5. Personal jurisdiction in this District is proper under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because Defendant Frontier has committed acts of infringement in the Commonwealth of Massachusetts, and in this District.

6. Venue is proper in this district because, on information and belief, Frontier is a foreign entity not having a regular and established place of business in any U.S. District.

Defendant makes and sells the accused infringing products, and offers to sell and sells them into the United States.

7. Upon information and belief, Frontier, directly or through intermediaries (including distributors, retailers, and others) offers for sale, sells, ships, distributes, and/or advertises its Accused Products in the United States and Commonwealth of Massachusetts.

8. Upon information and belief, Frontier has voluntarily marketed and sold infringing products in the United States, including in Nevada, Michigan, , and Massachusetts.

## **BACKGROUND**

9. Wildlife, founded in 2003, is the worldwide leading provider of bioacoustics monitoring technology for scientists, researchers, and government agencies.

10. Wildlife's customers use Wildlife technology to monitor birds, bats, frogs, insects, fish, whales, elephants, rhinos, and other wildlife. Wildlife audio recorders can be found on every continent across the globe, including Antartica.

11. Traditional techniques for monitoring animal populations in the wild are time and personnel intensive, typically requiring trapping the animals or conducting visual searches within the animal's native habitats.

12. The difficulty of accurately monitoring some animal populations can be exacerbated where the animals are only active during certain times of day, spend long stretches under cover or hibernating, or where environmental variation (*e.g.,* temperature, precipitation, humididty) can significantly influence an animal's habitat range or activity level. Traditional methods of monitoring animal populations that fail to account for these variables risk undercounting or overcounting populations.

13. In the 1990s, wildlife researchers began to use systems for automated data collection that could measure more variables, at more frequent intervals, across a larger potential habitat, without the need for research staff to remain on-site.

14. One such method of automated data collection for monitoring wildlife populations involves audio recording. Audio recordings can be used to detect the presence of a species and indicate its relative abundance within the range of the recording device.

15. However, audio recording technology in the 1990s and early 2000s had numerous disadvantages that limited their use by wildlife researchers. The limited range of fixed audio recorders meant that many devices would have to be used to cover the entire range of a species' habitat. Data storage limitations meant that tapes would have to be changed frequently. And the lack of electricity required the devices to also carry large batteries that would have to be changed frequently.

16. Early attempts to develop automated audio data collection technology failed to fully address these deficiencies. A typical solution involved combining an off-the-shelf tape recorder with a larger than normal battery connected by a simple timer or controller capable of turning the tape recorder on to record a sample, and turning it off again until the next sampling period using a relay. However, such controllers and relays required a significant amount of electricity even when the tape recorder was not recording, meaning large batteries and frequent battery changes were still required to keep the audio data collection devices operational.

17. Ian Agranat, founder and CEO of Wildlife, conceived of a solution that would more fully address the deficiencies of prior art automated audio data collectors for wildlife research. Mr. Agranat developed audio collection devices that could automatically record wildlife, while minimizing the drain on the battery. For example, by allowing the audio collection device to disconnect its own power in addition to other components leaving only a digital timer powered, and then allowing the digital timer to reconnect the controller's power to prepare for the next scheduled recording, Mr. Agranat was able to decrease the power drain of audio data collectors by orders of magnitude: from tens or hundreds of milliwatts of power in prior art devices, to only a few milliwats or less. These advancements significantly extended the

amount of time that automated audio data collection devices could record data before requiring maintenance, significantly reducing the operating costs associated with research personnel. The use of audio collection devices capable of disconnecting their own power source also allowed audio collection devices to use smaller and lighter batteries and were less expensive to produce than prior art devices. This allowed researchers to use more audio collection devices to cover a given area while carrying less weight, which is a significant consideration where such devices are installed in remote areas that may not be accessible by vehicle.

18. Wildlife's power-efficient microcontroller-based automated audio data collection devices quickly became the leading solution for automated audio data collection for wildlife research. Tens of thousands of Wildlife's audio data collection devices are in use in conservation programs and wildlife population surveys worldwide. The United States Geological Survey alone employed hundreds of Wildlife's SM2Bat+ devices across 276 sites to monitor bat populations across the Great Lakes basin and Upper Midwest. Wildlife Acoustics products have been cited in dozens of peer-reviewed research papers since 2010.

19. Wildlife manufactures and sells audio recording devices, including the Song Meter SM4, Song Meter SM4BAT, Song Meter Mini, Song Meter Mini Bat, and Echo Meter Touch 2 Pro.

20. On August 24, 2010, the United States Patent and Trademark Office ("USPTO"), after full and fair examination, duly and legally issued U.S. Patent No. 7,782,195 (the "'195 Patent"), entitled "APPARATUS FOR SCHEDULED LOW POWER AUTONOMOUS DATA RECORDING."

21. Wildlife holds all right, title, and interest in the '195 Patent with full rights to enforce the '195 Patent and sue and recover for past, present, and future infringement. A true and correct copy of the '195 Patent is attached as Exhibit A.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,782,195

22. Wildlife repeats and realleges the allegations of Paragraphs 1 through 21 above as if fully set forth herein.

23. Frontier manufactures and sells acoustic recording products, including but not limited to its "BAR" audio recording devices, that infringe one or more claims of the '195 Patent.

24. On information and belief, Frontier manufactures and sells additional products believed to infringe on one or more claims of the '195 Patent in substantially the same manner as its BAR audio recording devices, including its BAR-LT audio recording devices, in all versions and revisions that Frontier has manufactured, offered for sale or sold. All such products are hereinafter referred to as the "Accused Products."

25. On information and belief, Frontier is an Australian corporation and is not registered to do business with the Secretary of State in any state in the United States.

26. On information and belief, the Accused Products would be required to comply with FCC Part 15 regulations in order for said product to be sold in the United States.

27. On information and belief, the Accused Products do not comply with FCC Part 15 regulations.

28. On information and belief, the Accused Products incorporate patented technology that would require a license from the SD Card Association or licensees under the HALA agreements required to license SD Card intellectual property, in order for the Accused Products to be legally sold in the United States.

29. On information and belief, Frontier does not have a license from the SD Card Association or from licenees under the HALA agreements required to License SD Card intellectual property.

30. Frontier has marketed the Accused Products for sale in the United States, and has sold the Accused Products in the Untied States both directly to customers and through international distributors, including sales to customers located in this judicial district.

31. Upon information and belief, Frontier, or officers, employees or agents thereof, sponsored the 149th Annual Meeting and Joint Conference with the Wildlife Society in Reno, Nevada (the "Nevada Conference") from September 29, 2019 through October 3, 2019. The Nevada Conference is one of the largest annual conferences on the topic of wildlife research, conservation, and ecology, attended by thousands of professional researchers from across the United States and around the globe.

32. Upon information and belief, Frontier distributed brochures to Nevada Conference attendees, advertising the Accused Products for sale in the United States. Images of a copy of the Frontier brochure distributed at the Nevada Conference are shown below. The prices of products advertised in the flier were shown in United States dollars (USD).




33. On information and belief, Frontier has attended additional conferences and events in the United States for the purpose of advertising, offering for sale, or selling the Accused Products to customers in the United States.

34. On information and belief, Frontier attended the 2016 Ecoacoustics Congress in Lansing, Michigan for the purpose of advertising, offering for sale, or selling the Accused Products to customers in the United States.

35. Frontier has offered for sale or sold the Accused Products to customers in the United States, including to customers in this judicial district.

36. On information and belief, Frontier has intentionally solicited business from customers in this judicial district, including through its website, located at the domain name <frontierlabs.com.au.> On its website, Frontier offers pricing for the Accused Products in U.S. dollar amounts.

7

37. On information and belief, Frontier has authorized third parties to sell the Accused Products in the United States, including to customers in this judicial district.

38. Frontier has and continues to, without license from Wildlife, infringe the '195 Patent under 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling Frontier's Accused Products to consumers.

39. The '195 Patent describes battery-operated autonomous data recording devices, including low power devices that can be configured to operate on a recording schedule.

40. Claim 1 of the '195 Patent recites:

> 1. An apparatus for autonomous data recording comprising: a programmable timer having a programming interace and an alarm output; a power regulator having an enable input coupled to the alarm output, a power input and a power output; a power source coupled to the power input of the regulator; a controller coupled to the power output of the power regulartor and to the programming interface of the programmable timer; and a data recorder coupled to the power output of the power regulator; wherein the regulator has an operating state in which power is provided at the power output and an idle state; and wherein the power regulator is activated into the operating state by activation of the alarm output and deactivated into the idle state by deactivation of the alarm output.

41. Each and every element of independent claim 1 of the '195 Patent is present in the Accused Products, either literally or through the doctrine of equivalents.

42. Frontier hosts one or more publicly accessible versions of the user manuals for the Accused Products on a website owned and/or controlled by Frontier at the domain name <frontierlabs.com.au>. A true and correct copy of a document titled Bioacoustic Audio Recorder User Guide Version 1.4 (the "BAR User Guide"), is attached as Exhibit B to this Complaint.

43. Upon information and belief, the Accused Products incorporate an SAM3S SMART ARM-based Flash microcontroller manufactured by the Atmel Corporation. True and correct excerpts of an Atmel SAM3S SMART ARM-based Flash MCU Datasheet (the "MCU

Datasheet") are attached as Exhibit C to this Complaint. A complete version of the MCU Datasheet may be found at <http://ww1.microchip.com/downloads/en/devicedoc/Atmel-11090-32-bit%20Cortex-M3-Microcontroller-SAM-3S8-SD8_Datasheet.pdf>.

44. Below is a true and correct image of a circuit board taken from the 1.5 version of Frontier's BAR audio recording device. Upon information and belief the Atmel SAM3S SMART ARM-based Flash MCU is incorporated in the Accused Products where indicated:



45. The Accused Products are an apparatus for automous data recording.

46. Frontier's user guide for the Accused Products states "[w]e designed the [bioacoustics audio recorder] with the goal of creating the best possible bioacoustic recorder." (*BAR User Guide*, at p. 5).

9

47. The Accused Products possess a programmable timer having a progamming interface and an alarm output.

48. The MCU Datasheet explains that its "RTC [Real-time Clock] has five programmable fields: month, date, hours, minutes and seconds.… If all of the fields are enabled, an alarm flag is generated (the corresponding flag is asserted and an interrupt generated if enabled) at a given month, date, hour/minute/second." (*MCU Datasheet*, at p. 238, § 15.5.3).

49. The Accused Products possess a power regulator having an enable input coupled to the alarm output, a power input, and a power output.

50. The MCU Datasheet explains that "[t]he SAM3S embeds a voltage regulator that is managed by the Supply Controller." (*MCU Datasheet*, at p. 21, § 5.3). The SAM3S can be awakened by an "RTC [Real-time Clock] wake-up event." (*MCU Datasheet*, at p. 23, § 5.6.1).

51. Below is an excerpt from Figure 2-1 from the MCU Datasheet showing the voltage regulator having a power input and a power output:



(*MCU Datasheet*, at p. 5, Fig. 2-1).

52. The Accused Products possess a power source coupled to the power input of the regulator.

10

53. The MCU Datasheet explains that "[t]he SAM3S product has several types of power supply pins…, [including] VDDIN pin: Voltage Regulator Input. (*MCU Datasheet*, at p. 20, § 5.1). Upon information and belief, the Accused Products use a lithium-ion battery to power the voltage regulator U1 which in turn provides 3.3V to the VDDIN pin.

54. The Accused Products possess a controller coupled to the power output of the power regulator and to the programming interface of the programmable timer.

55. The MCU Datasheet explains that the "SAM3S series is a member of a family of Flash microcontrollers based on the high performed 32-bit ARM® Cortex®-M3 processor." (*MCU Datasheet*, at p. 1). Its power regulator is "intended to supply the internal core of SAM3S." (*MCU Datasheet*, at p. 21, § 5.3).

56. The Accused Products possess a data recorder coupled to the power output of the power regulator.

57. The MCU datasheet explains that "[t]he High Speed MultiMedia Card Interface (HSMCI)… supports the interfacing of 1 slot(s). Each slot may be used to interface with… an SD Memory Card." (*MCU Datasheet*, p. 793 § 36.1).

58. Below is an excerpt from the BAR User Guide showing an interior view of an Accused Product. The SD Memory Card, which serves as the data recorder of claim 1, is indicated in the BAR User Guide at Number 7:



59. The Accused Products possess a regulator that has an operating state in which power is provided at the power output and an idle state.

60. The MCU Datasheet explains that the "internal regulator . . . features two different operating modes." (*MCU Datasheet*, at p. 21 § 5.3). In the "normal mode," "the core clock run[s] from the fast RC oscillator, the main crystal oscillator or the PLLA." (*MCU Datasheet*, at p. 23, §5.5). The internal regulator also includes a "[b]ackup mode [that] is based on the Cortex-M3 deepsleep mode with the voltage regulator disabled." (*MCU Datasheet*, at p. 23, § 5.6.1).

61. The Accused Products possess a power regulator wherein the power regulator is activated into the operating state by activation of the alarm output and deactivated into the idle state by deactivation of the alarm output.

62. The MCU Datasheet explains that "[e]xit from the Backup mode happens if one of the following enable wake up events occurs: . . . RTC alarm." (*MCU Datasheet*, at p. 23, § 5.6.1). Further, "[b]ackup mode is entered by using [wait for event] instructions with the SLEEPDEEP bit in the System Control Register of the Corex-M3 set to 1." (*MCU Datasheet*, at p. 23, § 5.6.1).

63. Frontier has directly and/or indirectly infringed and continues to infringe at least claim 1 of the '195 Patent by making, using, offering for sale within the United States, and/or importing into the United States its Accused Products in violation of 35 U.S.C. §§ 271(a), (b), and/or (c).

64. Upon information and belief, Defendant has engaged in acts of direct infringement by itself and through agents acting in combination, such agents including, for example, and without limitation, distributors, suppliers, and others.

65. Customers and end-users of Frontier's Accused Products directly infringe the claims of the '195 Patent.

66. Frontier has instructed and/or directed customers and end-users to use Frontier's Accused Products in a manner that directly infringes the claims of the '195 Patent.

67. Frontier had written notice of its infringement by virtue of the cease and desist letter sent to Frontier on November 15, 2019. A copy of the cease and desist letter sent to Frontier on November 15, 2019 is attached as Exhibit C, and is incorporated herein by reference.

68. Upon information and belief, the foregoing acts of infringement by Defendant have been willful, intentional, and purposeful, in disregard of Wildlife's rights.

69. Frontier's infringement will continue to damage Wildlife's business, causing irreparable harm for which there is no adequate remedy at law, unless Frontier's wrongful acts are enjoined by this Court pursuant to 35 U.S.C. § 283.

70. Frontier's infringement has caused and continues to cause damage to Wildlife and Wildlife is entitled to recover damages pursuant to 35 U.S.C. § 284.

## EXCEPTIONAL CASE DETERMINATION

71. This is an exceptional case entitling Wildlife to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Wildlife prays for an order entering judgment as follows:

A. Frontier infringes claims of the '195 Patent;

B. Frontier, its officers, agents, servants, employees, and attorneys, and all persons acting in concert or participation with Frontier, be primarily and permanently enjoined from further acts of infringement;

C. Wildlife be awarded damages adequate to compensate it for Frontier's infringement, pursuant to 35 U.S.C. § 284, including prejudgment and post-judgment interest;

D. Wildlife be awarded treble damages, pursuant to 35 U.S.C. § 284;

E. An accounting and/or supplemental damages for all damages occurring after any discovery cutoff and through the Court's decision regarding the imposition of a permanent injunction;

F. An award of attorneys' fees based on this being an exceptional case pursuant to 35 U.S.C. § 285, including prejudgement interest on such fees;

G. Costs and expenses of this action; and

H. An award of such other and further relief as the Court deems necessary, just, and/or proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. Rule 38(b), Plaintiff hereby demands trial by jury of all issues so triable.

Dated: March 27, 2020	Respectfully submitted,

By: /s/ *Craig R. Smith*
Craig R. Smith (BBO No. 636,723)
Eric P. Carnevale (BBO No. 677,210)
**LANDO & ANASTASI, LLP**
60 State Street, 23rd Floor
Boston, MA 02109
Tel: (617) 395-7000
Email: csmith@lalaw.com
ecarnevale@lalaw.com

***Attorneys for Plaintiff Wildlife Acoustics, Inc.***